IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-03064-M

ENRIQUE RAY, )
)
Plaintiff, )
)
v. ) ORDER
)
COUNTY OF PENDER, et al., )
)
Defendants. )

This cause is before the court on defendants' pending motion for summary judgment. Mot. [D.E. 38]. For the reasons discussed below, the court grants the motion.

Relevant Procedural History:

On March 3, 2021, Enrique Ray ("plaintiff"), a state inmate proceeding *pro se* and without prepayment of fees, filed an unverified complaint under 42 U.S.C. § 1983. See [D.E. 1, 5, 11].

Plaintiff names as defendants Pender County and Pender C.I. Officers Demas ("Demas") and Edge ("Edge"), and alleges: at Pender C.I. on November 2, 2020, in a conspiracy with Demas and Edge, three white inmate members in the hate group "Bond for Glory" pulled him off his bunk and beat him while yelling racist invective; Demas "waited about 60 seconds, before commanding the [attacking inmates] to stop"; Edge observed the attack but "remained silent"; and his injures included stiches above his left eye, vision loss, and back pain. Compl. [D.E. 1] at 1–2.

In his unverified corrected complaint, plaintiff again names as defendants Pender County, Demas, and Edge, and sought to add as defendants the three unknown inmate attackers. Corrected Compl. [D.E. 4] at 3–5. Plaintiff specifically alleges: "(3) white male inmates Bond

for Glory, pulled me off my bunk while sleeping, and landed hard on cement floor, then began punching and kicking me, while yelling die nigger repeatedly as officers Demas and Edge watched from desk about (1) minute" until Demas "yelled stop." Id. at 5–6. As to his injury, plaintiff alleges he suffered the following: "(6) stiches above left eye, with vision slightly impaired, lower back pain and sleepless nights [sic]." Id. at 7. For relief, plaintiff asks the court to grant "compensatory damages for court costs, attorney fees and medical expenses for present and future treatment" and "punitive damages for hate crime act $700,000 [sic]." Id. at 8.

On March 29, 2021, plaintiff moved for a preliminary injunction, asking the "U.S. Department of Justice [ ] serve its full investigations process on his § 1983 complaint[.]" Mot. [D.E. 9] at 1. Plaintiff reiterates he was the victim of a hate crime because three white inmates yelled racist invective during the violent attack while white officers Demas and Edge watched. Id. at 1–2 (citing N.C. Gen. Stat. § 14-3(c), the Eighth Amendment, and the Equal Protection and Due Process clauses). Plaintiff also asserts that the attack "included conspiracy" because Demas and Edge allowed the attackers "about 60 seconds to [inflict] pain upon [plaintiff]." Id. at 2.

On August 27, 2021, plaintiff filed a verified, self-styled "supplemental complaint," alleging: after hospital discharge on November 10, 2020, he was placed in segregated custody; he does not "know why [he] was placed in the hole" because he was not written up, he was the victim of the attack, and he did not fight back; while in segregated custody, he was harassed by the three inmates that had attacked him and he caught COVID-19; after his release from segregated custody, he was "harassed by officers on a daily basis"; officers "did locker searches [and] destroyed [his] property," he "started getting write ups," and he is now in close custody whereas, before the attack, he was in medium custody; due to complications to his left eye, he now wears glasses; he suffers

from "PTSD, fright, nervousness, anxiety, [and] apprehension"; and he still has "twinges of pain in [his] back, neck severe headache, [and] nightmares." See Mot. [D.E. 15] at 2–3.

On January 25, 2022, the court granted the motions to amend, denied motions for injunctive relief and to appoint counsel, granted preservation of video evidence, dismissed claims against the inmates and Pender County, allowed the alleged failure-to-protect claim to proceed against Demas and Edge (collectively, "defendants"), and dismissed the remaining claims premised on, *inter alia*, conspiracy, due process and equal protection violations, and retaliation. See Order [D.E. 18].

On May 23, 2022, defendants answered the complaint. [D.E. 28].

On November 23, 2022, defendants moved for summary judgment, Mot. [D.E. 38], and filed a memorandum in support [D.E. 39], a statement of material facts [D.E. 40], an appendix [D.E. 41], and a motion to manually file a video exhibit, Mot. [D.E. 42].

Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam) ("Roseboro"), the court notified plaintiff about the motion for summary judgment, the response deadline, and the consequences of failing to respond. [D.E. 43].

On November 30, 2022, the court granted defendants' motion to manually file a video exhibit. Order [D.E. 44].

On December 14, 2023, plaintiff timely filed a response in opposition, [D.E. 45], together with a memorandum, [D.E. 45-1], an opposing statement of material facts [D.E. 45-2], and an appendix with various exhibits [D.E. 45-3] at 1–15.

Facts:

On November 9, 2020, Demas was a patrol officer and Edge was the Officer in Charge ("OIC") in the Carlie Dorm at Pender C.I. Defs.' Stmt. Mat. Facts. [D.E. 40] at ¶¶5–6. Three

3

offenders assaulted plaintiff, a Code-4 was called, officers responded and, as they arrived, plaintiff "was running out towards them." Id. at ¶¶7–10. After staff entered the dorm, the three attacking inmates "retreated to the back of the dorm," were "given directives to submit to restraints," and were "escorted out of the dorm." Id. at ¶¶12–14. The parties disagree about the actions of Edge,[1] and Demas,[2] where the attacking inmates were housed,[3] and the extent of plaintiff's injuries.[4]

Arguments:

In support of their motion for summary judgment, defendants argue, *inter alia*: plaintiff's official capacity claims fail under the Eleventh Amendment; defendants were not deliberately indifferent to plaintiff's safety because plaintiff neither shows a sufficiently serious injury nor demonstrates that defendants knew of an excessive risk of harm to plaintiff; or, alternatively, defendants are entitled to qualified immunity. See Defs.' Mem. [D.E. 39] at 6–12.

---

[1] Plaintiff states: "Edge allowed inmates Jacob Kennedy and Justin Powell to enter unauthorized wing"; "within minutes [,] plaintiff was attacked as defendants watched from the OIC desk"; and "I disagree defendant Edge was the first to observe the assault [,] which he reports in his report [,] and he failed to intervene by not calling Code-4 [,] which he admits he did not call code [sic]." Pl.'s Opposing Stmt. of Facts. [D.E. 45-2] at ¶¶1–2. Edge avers, *inter alia*: from the OIC desk, he saw offenders Jacob Kennedy, Bradley Robinson, and Justin Powell attack plaintiff with punches and kicks; he rushed towards the dorm, along with other correctional staff, and shouted for the offenders to stop assaulting plaintiff and they complied; and "[t]here was no use of force to stop the attack because the attackers disengaged from the attack upon staff entry into the dorm." Defs.' App., Ex. 3, Edge Aff. [D.E. 41-6] at ¶¶8–11.

[2] Plaintiff states: "I disagree defendant Demas arrived after he allowed the three inmates to inflict pain upon me no use of force was used caused plaintiff escaped assault [sic]. Pl.'s Opposing Stmt. of Facts. [D.E. 45-2] at 1. Demas avers, *inter alia*: offenders Jacob Kennedy, Bradley Robinson, and Justin Powell assaulted plaintiff; a Code-4, call for assistance, was called and Demas immediately responded; when Demas arrived, the assault had already ended; and "[t]here was no use of force to stop the attack because the attackers disengaged from the attack upon staff entry into the dorm." Defs.' App., Ex. 2, Demas Aff. [D.E. 41-5] at ¶¶8–11.

[3] Defendants both aver: "All three offenders were housed in the dorm where they assaulted [plaintiff]." Defs.' App., Ex. 3, Edge Aff. [D.E. 41-6] at ¶16; id., Ex. 2, Demas Aff. [D.E. 41-5] at ¶14. Plaintiff, by contrast, states: "I disagree, two of the inmates were housed in a different part of the dorm that's why they were written up for being in an unauthorized area." Pl.'s Opposing Stmt. of Facts. [D.E. 45-2] at ¶4.

[4] Defendants state that, as a result of the attack by the three fellow inmates, plaintiff was "treated for an eye injury." Defs.' Stmt. Mat. Facts. [D.E. 40] at ¶16. Plaintiff, by contrast, states: "I disagree I was treated for a left retrobulbar hemorrhage, received six stitches above left eye, diagnosis with PTSD and blur vision etc. [sic]." Pl.'s Opposing Stmt. of Facts. [D.E. 45-2] at ¶5.

4

Plaintiff argues, *inter alia*: defendants' "failure to implement policies and procedures constituted deliberate indifference which led to plaintiff being assaulted and injuries [sic]"; defendants, with a culpable mind, disregarded a substantial risk of harm to plaintiff when they allowed two assailants to enter an unauthorized sleeping area; "defendants knew from prior assaults that inmates posed a serious risk of harm being in the wrong wing/sleeping area"; defendants failed to adequately supervise inmate movement in the dorm; his resulting injures were objectively serious; defendants knew of a risk of harm to plaintiff "but disregarded that risk by failing to follow procedures established for inmate safety." Pl.'s Mem. [D.E. 45-1] at 6–10.

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

5

Case 5:21-ct-03064-M   Document 48   Filed 05/25/23   Page 5 of 14

Discussion:

First, although plaintiff labels his response to defendants' motion for summary judgment as a "motion for summary judgment," see [D.E. 45] at 1, because he shows neither the absence of a genuine issue of material fact nor the absence of evidence to support defendants' case, cf. Celotex, 477 U.S. at 325, he is not entitled to summary judgment, Anderson, 477 U.S. at 249–50; Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011) ("When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Rules of Civil Procedure.").

Next, plaintiff's claims against defendants in their official capacities are barred by the Eleventh Amendment unless the state has waived immunity. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989). Because North Carolina has not waived immunity, defendants are entitled to summary judgment on his official capacity claims. See Anderson, 477 U.S. at 249.

The court now turns to plaintiff's surviving failure-to-protect claim. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted). The first prong requires that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (quotation and emphasis omitted). The second prong requires a showing that "the officials acted with a sufficiently culpable state of mind." Id. (quotation and emphasis omitted); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

6

Although prison officials have a duty "to protect prisoners from violence at the hands of other prisoners," Farmer, 511 U.S. at 833 (citation and quotation marks omitted), an official will not be liable for a failure to protect an inmate "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Failure to alleviate a significant risk of harm that an official "should have perceived but did not" also does not violate a plaintiff's constitutional rights. Id. at 838. In short, a plaintiff must show: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the official was deliberately indifferent to that substantial risk to his health and safety; and (3) the official's deliberate indifference caused the harm. See id. at 834.

Contra defendants' arguments, the record supports plaintiff's claim that his injuries from the attack were objectively sufficiently serious. See Strickler, 989 F.2d at 1379; see also Pl.'s App., Ex. D-H, [D.E. 45-3] at 6–15. Nevertheless, for the reasons discussed below, plaintiff fails to satisfy the subjective component of a viable failure-to-protect claim.

Defendants' memorandum summarizes the video evidence of the attack as follows:

- 9:19:59 – Plaintiff is laying down on a bunk;
- 9:20:07 – The three inmates calmly enter the dorm and walk towards the back;
- 9:20:18 – The three inmates stop at a bunk and engage in conversation;
- 9:29:06 – Inmate Kennedy calmly walks towards front of dorm;
- 9:29:06 – Inmate Kennedy briefly stops to talk to Inmate Robinson;
- 9:29:10 – Inmate Kennedy calmly walks towards Plaintiff's bunk;
- 9:29:11 – Inmates Robinsons and Powell calmly follow Inmate Kennedy to Plaintiff's bunk;
- 9:29:12 – Inmate Kennedy grabs Plaintiff as Plaintiff lays on his bed and pulls Plaintiff to the ground;
- 9:29:14 – Inmate Kennedy begins to punch and kick Plaintiff;
- 9:29:15 – Inmates Robinson and Powell join in punching and kicking Plaintiff;
- 9:29:18 – As the inmates attack Plaintiff, Plaintiff attempts to get away from the inmates;

7

- 9:29:19 – Inmate Robinson continues punching Plaintiff in back of the head as Plaintiff continues to flee the attack;
- 9:29:21 – Inmate Kennedy runs over to continue punching Plaintiff as Inmate Robinson is punching Plaintiff;
- 9:29:22 – Plaintiff escapes the attack and runs out of the dorm;
- 9:29:23 – The inmates retreat to the back of the dorm;
- 9:29:29 – Defendant Edge enters the dorm and walks towards the three inmates;
- 9:29:36 – Defendant Edge addresses the three inmates;
- 9:29:39 – Defendant Edge secures Inmate Robinson and escorts him out of the dorm;
- 9:29:53 – Inmate Kennedy walks out of the dorm;
- 9:30:05 – Defendant Demas and another correctional officer enters the dorm;
- 9:30:11 – Defendant Demas and the other correctional officer give Inmate Powell a directive to come to them;
- 9:30:12 – Inmate Powell complies with the directive;
- 9:30:14 – Inmate Powell is escorted out of the dorm;

Defs.' Mem. [D.E. 39] at 4–5 (describing manually submitted video evidence, Pl.'s App., Ex. C).

After review of this video evidence, the court finds that defendants accurately describe the video which confirms the offenders' attack on plaintiff lasted approximately ten seconds, and that Edge and Demas had respectively entered the dorm to secure the attackers within 20 and 53 seconds of the beginning of the attack. Thus, as to his allegation that defendants merely watched the offenders attack him for one minute, plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." Scott, 550 U.S. at 379–80; see also Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011).

To support his new claims–that Edge failed to "call code" and defendants wrongly allowed two offenders into his dormitory wing–plaintiff relies on parts of defendants' responses to requests for admissions, Demas's deposition, and defendants' interrogatory responses. Pl.'s App., Ex. A-C, [D.E. 45-3] at 3–5. The court presumes, without deciding, that these documents are accurate.

In response to the request for admissions, Edge admits the assaulting offenders were written up for being in an unauthorized sleeping area and Demas specifies that two of the three

8

offenders were cited for a B-25 infraction, and that a basis for this charge includes being in an unauthorized location. See id., Ex. A [D.E. 45-3] at 3.

As to Demas's deposition, the questions and responses are as follows:

1. Were you the first to witness plaintiff being assaulted?

**Response: No.**

2. Did you or officer Edge write two of the inmates up for being in an unauthorized area?

**Response: I do not recall who wrote the inmates up for being in an unauthorized area.**

3. How did the two inmates gain entry to another sleeping area that time of the night?

**Response: I do not know how the inmates gained entry into the sleeping area.**

4. Who was the officer at the control desk when those two inmates walked by it to enter another sleeping area?

**Response: I do not know.**

5. What was your duty as the patrol officer the night of the incident?

**Response: I was the Patrol Officer for Charlie Dorm. Duties include overseeing movement and activities within the wings and the dorm. The patrol officer also helps complete the shift narratives throughout their shift. There are 4 wings in a dorm and are approximately 32 beds in each wing, bringing the total capacity of the dorm to approximately 128 beds.**

6. Why didn't officer Edge call the code first if he was the first one to observe three inmates kick and punch plaintiff?

**Response: I presume officer Edge did not call the code because he heard me call the code a few seconds after he first observed the disturbance in the dorm.**

Id., Ex. B [D.E. 45-4] at 4.

As to the interrogatories, the questions and responses are as follows:

9

4. State how inmates enter an unauthorized area if staff is present at control desk and duty post.

Response:
Demas: Inmates exit their designated wings for various reasons. For example, they can go to medical, programs, could be k-9 handlers, could be going for yard time, they could be called to operations for write-ups, etc. When inmates exit their designated wings, they may exit for an authorized reason, then walk into a different wing unbeknownst to the Patrol Officer or OIC.

Edge: Considering there are 130 inmates to two staff members, it may be possible for an inmate to slip by.

5. State the first thing staff is to do if they witness an inmate assault.

Response:
Demas: Call the code (Code 4) – call for assistance.

Edge: Notify immediate staff in the area and call code on radio.

6. Identify and attach a copy of any and all documents relating to if staff witness inmate assault.

Response:
Demas: See attached SOP regarding Dormitory Officer's and Use of Force.

Edge: See attached SOP regarding Dormitory Officer's and Use of Force.

7. Identify how the inmates were able to enter an unauthorized sleeping area that time of the night.

Response:
Demas: This incident occurred prior to lockdown. See response to Interrogatory number 4.

Edge: See response to Interrogatory number 4.

Id., Ex. C [D.E. 45-3] at 5.

Viewing these documents in the light most favorable to plaintiff, he has shown that two of the three assaulting offenders were in an unauthorized area at the time of the attack, and that code

10

was not called by the first officer who saw the attack. These documents, however, do not provide any support for plaintiff's assertion that "defendants knew from prior assaults that inmates posed a serious risk of harm being in the wrong wing/sleeping area." Cf. Pl.'s Mem. [D.E. 45-1] at 7.

Moreover, although plaintiff disputes Demas' response as to how two of the assaulting inmates may have exited their designated wing before the attack, plaintiff provides no support, aside from his own bald say-so, that "those two inmates also had on black shorts which means they were not exiting the dorm that time of night to go to medical, dog training, school etc. Inmates are not allowed to exit dorm at night with black shorts on." Id. at 4; see Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

Although he now argues that defendants violated policy by allowing two of the attackers into the wrong wing of the dorm, and when Edge failed to call the Code 4 as soon as he observed the attack, plaintiff did not allege policy violations in his pleadings, and he may not amend his complaint through argument in opposition to defendants' motion for summary judgment. See Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished) (citing Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)).

Further, in their responses to requests for admissions and to interrogatories, defendants deny that their actions during this incident violated policy. See Pl.'s App., Ex. A [D.E. 45-3] at 3 (denying requests for the following admission–that "staff violated policy by allowing those inmates to enter a sleeping area besides their own," that "staff failed to intervene by not calling code when he first observed the assault and other staff had to call the code that was on duty [sic]";

11

and that "Officer Demas and Officer Edge, two white officers, watched three white inmates attack Plaintiff who is black."); id., Ex. C [D.E. 45-3] at 5 (Edge responding that the first thing to do after witnessing an inmate assault is to "[n]otify immediate staff in the area and call code on radio.").

Moreover, even if defendants' actions violated policy, "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of constitutional violation." Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (unpublished); Joyner v. Patterson, No. CA 0:13-2675-DCN-PJG, 2014 WL 897121, at *4 (D.S.C. Mar. 6, 2014) ("Violations of prison policies alone do not rise to the level of a constitutional deprivation." (citation omitted), report and recommendation adopted, No. 0:13-CV-2675-DCN, 2014 WL 3909531 (D.S.C. Aug. 11, 2014), aff'd, 597 F. App'x 748 (4th Cir. 2015).

Here, Edge and Demas aver, *inter alia*: when Edge saw the offenders attack plaintiff, he "rushed towards the dorm, along with other correctional staff, and shouted for the offenders to stop assaulting plaintiff"; "A Code-4, call for assistance, was called and [Demas] immediately responded"; Edge and Demas had respectively worked at Pender C.I. for two and three years and were very familiar with plaintiff; neither defendant ever had an issue with plaintiff; prior to the assault, plaintiff "never told [Edge or Demas] that he feared for his safety from these three inmates or any other inmate"; and, if plaintiff "would have communicated that he was in fear, we would have taken the proper steps to make sure he was separated from those offenders." Defs.' App., Ex. 3, Edge Aff. [D.E. 41-6] at ¶¶9, 17–20; Id., Ex. 2, Demas Aff. [D.E. 41-5] at ¶¶9, 15–18.

By contrast, the complaint and corrected complaint are unverified. Cf. Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021). Although plaintiff's August 27, 2021, self-styled "supplemental complaint" is verified, the claims therein were not allowed to proceed, see Order

12

[D.E. 18], and plaintiff did not reiterate the surviving failure-to-protect claims against defendants. Compare [D.E. 15], with Compl. [D.E. 1], and Corrected Compl. [D.E. 4]. Moreover, plaintiff has not offered other affidavits or declarations in opposition to defendants' motion for summary judgment despite receiving adequate notice pursuant to Roseboro and having an opportunity to do so, see Celotex, 477 U.S. at 324; cf. Pledger v. Lynch, 5 F.4th 511, 525–27 (4th Cir. 2021).

In sum, plaintiff fails to demonstrate that defendants knew of, but disregarded, a substantial risk of serious harm to plaintiff, Farmer, 511 U.S. at 837, recognized their "actions were insufficient to mitigate the risk of harm," Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation marks and citation omitted), or otherwise acted with the requisite culpable state of mind, Strickler, 989 F.2d at 1379; see Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment).

Instead, plaintiff has demonstrated, at most, defendants' mere negligence as to this attack, the danger of which defendants "should have perceived but did not." Farmer, 511 U.S. at 838. This showing is insufficient to satisfy the subjective component of a viable Eighth Amendment claim. See Whitley v. Albers, 475 U.S. 312, 319 (1986) (noting it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); Ruefly v. Landon, 825 F.2d 792, 793 (4th Cir. 1987) ("Mere negligent conduct on the part of prison officials who fail to protect a prisoner from a risk of harm posed by fellow inmates does not constitute a violation of the eighth amendment's prohibition against cruel and unusual punishment."); see also Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard–a showing of mere negligence will not meet it.").

13

After considering the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, the court finds defendants have met their burden of showing the absence of a genuine issue of material fact as to plaintiff's failure-to-protect claim, Celotex, 477 U.S. at 325, whereas plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Accordingly, defendants are entitled to summary judgment. See Anderson, 477 U.S. at 249.

Alternatively, because they are government officials, defendants are entitled to qualified immunity from civil damages so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Here, because plaintiff has not demonstrated that defendants violated his constitutional rights, defendants likewise are entitled to a finding of qualified immunity.

### Conclusion:

For the reasons discussed above, the court GRANTS defendants' motion for summary judgment [D.E. 38] and DENIES plaintiff's motion for summary judgment [D.E. 45]. The clerk shall close the case.

SO ORDERED this 25th day of May, 2023.

Richard E Myers
RICHARD E. MYERS II
Chief United States District Judge

14